# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

|  |  |  |
|---|---|---|
| DOROTHEA CHRISTIAN, | : | |
| Plaintiff, | : | Case No. 3:12cv00194 |
| vs. | : | District Judge Thomas M. Rose |
| CAROLYN COLVIN, | : | Chief Magistrate Judge Sharon L. |
| Acting Commissioner of the Social | | Ovington |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

Plaintiff Dorothea Christian brings this case challenging the Social Security

Administration's denial of her applications for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI). Plaintiff filed her SSI and DIB applications on

January 23, 2008, asserting that she has been under a benefits-qualifying "disability"

since February 1, 2007. To establish the existence of her disability, she points to her

"thoracic aortic dissection, renal artery, cardiac valvular, lift hand cramps/locks, and

spasms in [her] chest." (Doc. #36, PageID at 206).

After various administrative proceedings, Administrative Law Judge (ALJ) Amelia

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

G. Lombardo, denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  *Id.* at 59-67. This Court has jurisdiction to review ALJ Lombardo's decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks an Order remanding the case to the ALJ to address "all of [Plaintiff's] impairments and the impact thereof." (Doc. #8, PageID at 446). The Commissioner seeks an Order affirming the ALJ's decision.

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff asserts a disability onset date of February 1, 2007.  On that date, she was 48 years old, which placed her in the category of a "younger person" under Social Security regulations. 20 C.F.R. §§404.1563(c); 416.963(c).[2] She turned age 50 in March 2008, placing her in the category of a person "closely approaching advanced age." 20 C.F.R. §404.1563(d). She has a high school education. Her past jobs include work in a nursing home as a housekeeper and dietary aid. She has also been a restaurant worker.

Plaintiff underwent surgery involving an aortic dissection and kidney stent in

---

[2] The remaining citations will identify the pertinent DIB regulations with full knowledge of the corresponding SSI regulations.

September 2002 and further surgery in August 2003 involving an aneurysm. (More on her

surgeries later.)

In 2008 Plaintiff was interviewed in connection with her benefits applications. The

interviewer's report states, in part:

> Cl[aimant] said that she does have a cardiologist, Dr. Jamal, from the
> Cleveland Clinic and has not seen him since 2003 due to financial
> restraints. Clmt. said that she has chest pains, soreness, her hands cramp up
> and she has pains in them, [and] clmt. said that she is having left side pains.
> Clmt. said she gets chest pains at various times: with activity and without.
> Clmt. said that she also gets chest tightness....

*Id*. at 214. The interviewer reported that Plaintiff "complained about her hands

cramping," and the interviewer observed, "[s]he took her time signing the medical

releases. She is [a] short woman and she wabbles or walk[s] from side to side." *Id*. at 203.

During the ALJ's hearing, Plaintiff testified that she is 4'6" tall and weighs 183

pounds. *Id*. at 75. She explained that she is unable to work due to endurance issues. Her

problems first started when she tried to climb stairs and could not breathe. *Id.* at 78. She

also explained, "every now and then I get a sharp quick pain. And if I try to turn around a

lot and stuff, the muscle spasm tightens up and then I have to wait and try to rub it and

[I'll] be okay again." *Id*. at 80-81. When asked where the pain is located, she testified,

"on my left side where you think the heart might be in my chest and sometimes in my

back. But mostly in the front." *Id*. at 88. Sometimes turning causes this pain; other times

it occurs when she is not doing anything. The pain occurs once or twice a week, if she

spends her time sitting and does not do much.

3

Plaintiff estimated that she can walk 2 blocks at one time. *Id*. at 81. She does not have trouble standing for a short time, but she explained, "When I walk and stuff and stand I get tired and I will start leaning up against something." *Id*. She further testified that she follows a doctor's instruction not to lift more than 10 pounds. *Id*. at 83-84. She estimated that she can stand for 30 minutes before she needs to lean against something or sit down. She also estimated that she was limited to sitting for about 1 hour due to side and back pain. *Id*. at 83, 89.

Plaintiff takes high blood pressure medicine when she can afford it. *Id*. at 79-80. When her blood pressure is elevated, she becomes dizzy and lightheaded. *Id*. at 92. She also experiences pain and muscle spasms in her left hand when she uses it for even doing simple things, like "putting stuff in a baggy and ziplocking it." *Id*.

Plaintiff attempted to work at the Salvation Army folding clothes and putting leaflets together. However, she was unable to continue this job due to her hands being stiff and, sore, and she was unable to move them. *Id*. at 83.

As to her daily activities, Plaintiff gets tired when she does dishes, and she takes her time doing household chores. *Id*. at 84, 90. She cooks easy meals by using a microwave oven. She does not have friends and does not go outside. She has no hobbies and does not exercise. *Id*. at 85. She spends her day trying to clean the house a little, and she watches television. Her nieces and nephews sometimes visit her. Her good days occur only when she avoids doing much, such as activities that require endurance. *Id*. at 90.

## B. <u>Medical Records and Opinions</u>

4

**1.**

**Plaintiff's Treatment Records**

Dr. O'Donnell was Plaintiff's treating physician from August 8, 2002 to July 9, 2008. (Doc. #6, PageID at 360-89, 411-21). In August 2002 her blood pressure was 138/90 and she weighed 165 pounds. *Id*. at 420.

Plaintiff went to the Miami Valley Hospital Emergency Room with chest pain on September 19, 2002. (Doc. #6, PageID at 258-72). She was admitted and underwent a CT of the chest which revealed a type B dissection compromising the right renal artery. She underwent an aortogram with successful recanalization of the right renal artery. She was found to have a Type B thoracic aortic dissection with acute right-renal-artery occlusion. The attending physician believed that she may represent an undiagnosed Turner's Syndrome. "Turner Syndrome, a condition that affects only girls and women, results from a missing or incomplete sex chromosome. Turner Syndrome can cause a variety of medical and developmental problems, including short stature, infertility, heart defects, an certain learning disabilities." http://www.mayoclinic.com (search for Turner Syndrome in diseases and conditions database).

Upon discharge on October 2, 2002, Plaintiff's diagnoses included Type B thoracic-aortic dissection; right-renal artery-occlusion; essential hypertension; nosocomial pneumonia; urinary tract infection; controlled congestive heart failure; and cardiac valvular insufficiency.

On October 17, 2002 Plaintiff saw cardiologist Dr. Jamal for a follow-up visit. Her

blood pressure was 120/82 and she weighed 153 pounds. Dr. Jamal observed, "In general, she is a short-statured female. She has a short neck without jugular venous distention...." *Id*. at 409.  Dr. Jamal also noted, "this patient presented with a type B aortic dissection status post successful recanalization of the right renal artery with percutaneous transluminal coronary angioplasty and stent. At this time she appears to be doing well...." *Id*. at 409.

Plaintiff next saw Dr. Jamal in January 2003. Her blood pressure was 126/78. Dr. Jamal reported that Plaintiff "recently had an MRA of her thoracic artery for follow-up on her dissection, and this showed aneurysmal formation with the dissection in the distal thoracic arch extending to the proximal descending thoracic aorta." *Id*. at 407. Dr. Jamal noted, "Dr. Lemmon felt that we should refer her to the Cleveland Clinic for further evaluation and possible intervention on the aneurysm." *Id*.

In February 2003, Plaintiff began seeing Roy Greenberg, M.D., a cardiovascular surgeon at the Cleveland Clinic. Based on a CT scan, Dr. Greenberg found that Plaintiff's right-renal artery was occluded. He noted that her blood pressure appeared to be well controlled on Toprol along with a Catapres patch, "which is excellent in terms of her long term prognosis." (Doc. #6, PageID at 401). He found Plaintiff had a 5.0 cm thoracic aneurysm directly opposite an aberrant right-subclavian artery. He felt there was potential for endovascular repair.

In June 2003, Plaintiff saw Dr. Hussain, a colleague of Dr. Jamal. Dr. Hussain noted that Plaintiff had been checking her blood pressure every day at home; it had been

higher than usual, running "in the range or 150-160 systolic, and 100-110 diastolic." *Id*. at 405. She did not report chest pain or shortness of breath.  *Id*.

In July 2003, Plaintiff visited Dr. Jamal for "followup of her hypertension." *Id*. at 404. Dr. Jamal noted that her blood pressure had been increasing over the last couple of months. Her blood pressure on this visit was 158/104. *Id*.

In early August 2003, Plaintiff was admitted to the Cleveland Clinic Hospital with the primary diagnosis of "thoracic aortic aneurysm [with] dissection." *Id*. at 281. She underwent two surgeries: a left carotid sub bypass and TAA stent graft. *Id*. at 281, 301-05. Upon her discharge from the Cleveland Clinic, Dr. Greenburg noted, in part, that Plaintiff's primary diagnosis was thoracic aortic aneurysm with dissection with the additional diagnosis of Turner's Syndrome. *Id*. at 281.

Plaintiff followed up with Dr. Greenburg one month after her surgery.  Dr. Greenberg reported that Plaintiff "has really done quite well." *Id*. at 400. He felt her hypertension was "well controlled." *Id*. He noted, "her diagnosis was worked out to arch abnormalities that were linked to Turner's syndrome...." *Id*. at 400.

In February 2004, Dr. Greenberg concluded that Plaintiff was "doing very well-still has intermittent pain although difficult to describe or quantitative [sic] but decreasing in frequency. Her aneurysm has decreased in size and measures about 4.4 cm without an endoleak." *Id*. at 299. He further noted that Plaintiff had done well since her initial dissection, and her blood pressure is "well-controlled, running in the 130s." *Id*. But he noted, "Perhaps we can control her BP more aggressively." *Id*. He further noted, "We will

7

also give her a letter for weight restriction for work of 30 [pounds]." *Id*.

On March 15, 2004, Plaintiff saw Dr. Jamal. She denied any resting shortness of breath, yet she reported some sharp occasional chest pain not related to exertion which would last for 2 seconds and resolve spontaneously. After examining Plaintiff, Dr. Jamal concluded:

> I believe at this time that the patient's blood pressure is well controlled. Her chest pain is very atypical for coronary artery disease, and she told me that Dr. Greenburg, her vascular surgeon up at the Cleveland Clinic, was not very concerned about these short episodes of sharp pain....

*Id*. at 402.

On April 26, 2004, Plaintiff reported to Dr. O'Donnell that she was tired and sleepy a lot; her blood pressure was 130/90 and she weighed 158 pounds. Dr. O'Donnell limited Plaintiff to lifting no more than 20 pounds. *Id*. at 418.

Dr. O'Donnell's treatment notes show that on September 10, 2004, Plaintiff weighed 162 pounds and her blood pressure was 130/88. *Id*. at 417.

On January 31, 2006, Plaintiff saw Dr. O'Donnell. She reported dizziness, fatigue, cramping in her hands. Her blood pressure was 128/80 and she weighed 170 pounds. *Id*. at 416.

Plaintiff next saw Dr. O'Donnell on February 20, 2007. She reported back pain on her left side, left-breast pain, trouble breathing, and cramping in her hands. Dr. O'Donnell noted a positive Tinel's sign and thoracic tenderness. Her blood pressure was 158/110 and

she weighed 170 pounds. *Id*. at 413-14.

On October 22, 2007, Plaintiff again saw Dr. O'Donnell. Her blood pressure was 138/110 and she weighed 171 pounds. Dr. O'Donnell noted increased blood pressure and hand numbness. A notation of "not able to work" appears in the history section of this treatment note. *Id*. at 364. Dr. O'Donnell indicated that Plaintiff needed a follow-up with the Cleveland Clinic but could not afford it.  *Id*. at 364, 412.

On March 26, 2008, Dr. O'Donnell's treatment notes again state that Plaintiff was "unable to work." *Id*. at 362. Her blood pressure was 184/110 and she weighed 173 pounds. Her hand ached and she could not afford "follow ups." *Id*.

On July 9, 2008, Plaintiff's blood pressure was 160/110; her weight was 180 pounds. *Id*. at 360.

On February 26, 2009, Plaintiff underwent a CT angiogram of her abdomen and chest. The impression identified a "DeBakey III abdominal aortic dissection and extending into both iliac arteries with mild aneurysmal disease. Atrophy right kidney. Left renal cyst and subcentimeter right renal cyst. Status post right renal stent placement." *Id*. at 426.

## 2.
## Damian Danopulos, M.D.

In May 2008, Dr. Danopulos examined Plaintiff at the request of the Ohio Bureau of Disability Determination. (Doc. #6, PageID at 340-49). Plaintiff was 50 years old at that time. Plaintiff reported having chest pain, left-hand pain, and high blood pressure.

A chest x-ray showed an enlarged aortic arch protected by an expendable cage that extends down toward the thoracic aorta. Dr. Danopulos listed his objective findings as aortic aneurysm in the upper thoracic area protected by an expendable cage to protect it from further dilation; unusually high blood pressure despite treatment; and morbid obesity in a person of very short stature to a degree of nanismus.

In his summary, Dr. Danopulos wrote that Plaintiff "was diagnosed [with] high blood pressure in the Miami Valley Hospital four years ago. Possibly this was the reason that she developed the aortic aneurysm in the aortic arch and the descending thoracic aorta. She started being treated properly and she continues to be treated for that. On clinical examination her blood pressure was 180/110mmHg and still very high." *Id*. at 343.

Dr. Danopulos concluded:

> [Plaintiff's] ability to do any work related activities is restricted considerably from the combination of her morbid obesity plus her unusually elevated blood pressure which triggered thoracic aortic aneurysmal dilation in the past and which was protected with an expendable cage which prevents it from fa[r]ther dilation.

*Id*., PageID at 344.

### 3.
### Charles Derrow, M.D./Kathryn Drew, M.D.

Dr. Derrow reviewed Plaintiff's records in May 2008 for the Ohio Bureau of Disability Determinations. (Doc. #6, PageID at 352-59). Dr. Derrow noted that he did not have medical evidence of record for the time period between her alleged disability onset date (February 1, 2007) and her date last insured (February 31, 2007). *Id*. at 353.

Dr. Derrow opined that Plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.

Dr. Derrow thought that Plaintiff could never climb ladders, ropes, or scaffolds, and could occasionally climb ramps or stairs. He believed that Plaintiff's statements were partially credible, noting that the medical evidence "does not support hand cramps or any impairment of her hands." *Id*., PageID at 357. Dr. Derrow observed that Dr. Danopulos "gives a general, but not specific limitations. He states that [Plaintiff] is considerably limited.... There is no actual functional statement by the doctor." *Id*. at 358.

In October 2008, Dr. Drew reviewed Plaintiff's file and affirmed Dr. Derrow's assessment without providing any supporting explanation. *Id*., PageID at 391.

## III.   Administrative Review

### A.   "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

11

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  The Sequential Evaluation

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2013).

### C.  ALJ Lombardo's  Decision

ALJ Lombardo's pertinent findings began at step 2 of the sequential evaluation where she concluded that Plaintiff had the severe impairments of "obesity and the residuals of an aortic aneurysm." (Doc. #6, PageID at 61).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. *Id*. at 62.

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity to perform light work and further concluded that she is restricted to no more than occasional climbing of stairs.[3] *Id*. The ALJ found that in light of her residual functional capacity, Plaintiff could perform her past relevant work as a dietary aide and housekeeper. *Id*. at 66.

At Step 5, the ALJ concluded that even if Plaintiff could not perform her past relevant work, she could perform a significant number of jobs that exist in the regional and national economy. *Id.*

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.

## IV.    <u>Judicial Review</u>

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

14

*Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not consider, and made no determination regarding, the severity of her Turner's Syndrome and did not consider parts of Plaintiff's testimony concerning her "fatigue, sharp pains, muscle spasms, dizziness due to her high blood pressure, and a need to frequently rest if participating in activities." (Doc. #8, PageID at 443 (citing PageID at 78-85, 88-93)).

"In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition." *Rogers*, 486 F.3d at 247 (citations omitted); *see Kirk v. Secretary of HHS,* 667 F.2d 524, 538 (6th Cir. 1981)(pain alone may constitute a disability). When evaluating pain or other symptoms, the Commissioner's Regulations require ALJs to consider all the evidence including medical history, medical signs and laboratory findings, the claimant's statements, and treating and other medical source opinions. 20 C.F.R. §404.1529(c)(1).

A two-part analysis applies to resolving credibility issues:

First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he [or she] must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. Relevant factors for the ALJ to consider . . . include the claimant's daily activities; the location, duration, frequency, and intensity of

15

symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.

*Rogers*, 486 F.3d at 247 (citing, in part, Social Sec. Ruling 96–7p, 1996 WL 374186, at

*2–3 (July 2, 1996) (other citations omitted)).

An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."

*Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).

"Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*.

The ALJ correctly recited the standards applicable to reviewing Plaintiff's credibility. *See* Doc. #6, PageID at 62-63. The ALJ concluded:

> The claimant may have some functional limitations associated with documented physical impairment, but the weight of the evidence of record does not establish that such impairment would render the claimant totally disabled from all work activity.

*Id*. at 63. The ALJ also concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

16

*Id*. at 64.

The first evidence the ALJ relies on in support of her credibility conclusions relates to Plaintiff's surgery and her recovery from September 2002 through early 2004. The ALJ observed that Plaintiff's recovery was "generally successful," and the ALJ quotes a clinic note dated August 5, 2003, which states "'Patient is doing very well – still has intermittent pain although difficult to describe or quantitative [sic] but decreasing in frequency. Her aneurysm decreased in size and measures about 4.4 cm without an endo leak. Her initial dissection was 9/02 and she has done well – her BP is well-controlled, running in the 130s...'" (Doc. #6, PageID at 64)(quoting PageID at 299). Although this evidence would be pertinent to Plaintiff's condition at the time she was recovering from surgery, it says little, if anything, about her health, work limitations, and credibility either (1) on her alleged disability onset date nearly 3½ three years later (February 1, 2007) or (2) at the time she testified more than 6 years later (during the ALJ's June 2010 hearing). Plaintiff testified during the ALJ's hearing that she suffers from fatigue, sharp pains, muscle spasms, dizziness due to her high blood pressure, and a need to frequently rest if participating in activities. She becomes fatigued just doing the dishes. She is only able to lift 10 lbs, stand 30-45 minutes, and walk two blocks. The ALJ did not specifically address this testimony or explain how the evidence of her initial recovery from her surgeries 6 years earlier detracts from her credibility. The ALJ merely recognized that Plaintiff continued to have troubling controlling her blood pressure without considering that such evidence tends to support her testimony about her dizziness, fatigue, and need to

17

frequently rest when even minimally active.

Perhaps more significantly, the ALJ did not mention the impact Turner Syndrome had upon Plaintiff's health, work limitations, or credibility. There is consequently no indication that the ALJ considered Turner Syndrome as the causative force behind her high blood pressure, dizzy spells, and fatigue. This constituted an error because Social Security Regulations required the ALJ to consider all the evidence of record. *See* 20 C.F.R. §404.1529(c)(1). The Commissioner contends that the ALJ did not err because the mere diagnosis of Turner Syndrome does not indicate the severity of an impairment and does not prove the existence of a benefits-qualifying disability. It is correct that a diagnosis by itself does not indicate the severity of an impairment and cannot establish a disability. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). But this is not the point. The ALJ's error is not the she failed to adopt a mere diagnosis; rather, she failed to consider the possibility, if not probability, that Turner Syndrome causes Plaintiff's continuing struggles with high blood pressure, fatigue, chest pain with activity, and dizziness, and tends to support the credibility of her statements about the severity of these health problems. The ALJ, moreover, did not consider whether Plaintiff's Turner Syndrome constituted a severe impairment at Step 2 of the sequential evaluation, where Plaintiff faced a low hurdle. *See Higgs*, 880 F.2d at 862 ("Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."). Such consideration was needed due to the serious nature of Turner Syndrome and its effect, and

18

due to Plaintiff's history of aortic dissection and high blood pressure. *Cf. McCarty v. Astrue*, 2008 WL 4922323 at *3 (M.D. Pa. Nov. 13, 2008)(ALJ found Turner Syndrome to constitute a severe impairment at Step 2); *cf. also Richard v. Astrue*, 2009 WL 1675989 (W.D. La. June 15, 2009)("It is particularly noteworthy to this Court that Turner's syndrome, which Plaintiff has suffered from her entire life, is known to increase the risk of heart attack."); Doc. #6, PageID at 343 (Dr. Danopulos observed that Plaintiff's high blood pressure was "[p]ossibly ... the reason that she developed the aortic aneurysm in the aortic arch and the descending thoracic aorta.")..

The ALJ's credibility discussion considers the opinions provided by Drs. Danopulos, Derrow, and Drew. The ALJ credited Dr. Derrow's opinion that Plaintiff could perform light work with climbing restrictions "because it is consistent with the objective medical evidence in the record, particularly with respect to Dr. Danopulos' essentially normal clinical findings and the records from the Cleveland Clinic." (Doc. #6, PageID at 65). The problem with the ALJ's reliance on Dr. Derrow's opinion is that the records from the Cleveland Clinic are from 2003-2004, nearly 3½ years before Plaintiff's alleged disability onset date. In addition, Dr. Derrow reviewed the administrative record before it contained medical records from Plaintiff's treating physician, Dr. O'Donnell, from September 2002 to July 2008. These records document, in part, high blood pressure readings: 158/110 on February 20, 2007; 184/110 on March 26, 2008; 160/110 on July 9, 2008. (Doc. #6, PageID at 360, 362, 366). Similarly, when Dr. Danopulos checked Plaintiff's blood pressure on May 6, 2008, it was 180/110. *Id.* at 341. Dr. Derrow,

19

moreover, made no mention of Turner Syndrome or Plaintiff's high blood-pressure readings, the existence of which tend to support Plaintiff's credibility. As a result, Dr. Derrow's incomplete record review and resulting opinions do not constitute substantial evidence in support of the ALJ's credibility determination.

The ALJ also relied on Dr. Drew's review of the record and her agreement with Dr. Derrow. Dr. Drew, however, merely provided her conclusory affirmation of Dr. Derrow's opinions without any supporting rationale or reference to any medical evidence. Her conclusory opinion is, therefore, patently unfounded and does not constitute substantial evidence in support of the ALJ's credibility determination. *See* 20 C.F.R. §404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion."); *see also* Social Security Ruling 96-6p, 1996 WL 374180 at *2 ("the opinions of State agency medical ... consultants ... can be given weight only insofar as they are supported by evidence in the case record....").

Plaintiff contends that the ALJ erred by denying her request for a cardiologist medical advisor to testify at the administrative hearing. The Commissioner correctly points out that the ALJ has the discretion to deny a request for a medical advisor. *See Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)(and sources cited therein). "An administrative law judge abuses his [or her] discretion only when the testimony of a medical expert is 'required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations....'" *Wise v. Astrue*, 2010 WL 3075184 at *2 (S.D. Ohio

Aug. 4, 2010)(Marbley, D.J.) (quoting 20 C.F.R. § 416.1444; citing *Haywood v. Sullivan*,

888 F.2d 1463, 1467-68 (5th Cir.1989)). It is unnecessary to determine whether the ALJ

abused her discretion by denying Plaintiff's request for a cardiologist medical advisor due

to the need for a remand in this case. However, it appears that the ALJ, as a lay person, is

not in a position to determine the medical effects Turners Syndrome has on Plaintiff. *See*

*Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000)("[A]n ALJ must not substitute his

own judgment for a physician's opinion without relying on other evidence or authority in

the record."); *see also Meece v. Barnhart,* 2006 WL 2271336 at *8 (6th Cir.2006)( "the

ALJ may not substitute his own medical judgment for that of the treating physician where

the opinion of the treating physician is supported by the medical evidence). Additionally,

because no medical expert of record has reviewed all of Plaintiff's medical records or

addressed her Turners Syndrome, it further appears that the ALJ would benefit from an

expert cardiologist's opinions and would need such opinions to conduct a full inquiry into

Plaintiff's allegations on remand. *See Wise*, 2010 WL 3075184 at *2.

Accordingly, Plaintiff's Statement of Errors is well taken.[4]

## VI.  __Remand is Warranted__

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits. Under Sentence Four of  42

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis
of the parties' remaining contentions is unwarranted.

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand the ALJ should be directed to evaluate Plaintiff's credibility as required by the Regulations, Rulings, and case law and otherwise review her disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for DIB and/or SSI.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Dorothea Christian was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.  The case be terminated on the docket of this Court.

July 25, 2013                                    s/Sharon L. Ovington
                                              Sharon L. Ovington
                                     Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

23